Opinion filed October 19, 2006

















 
 
  
 
 







 
 
  
 
 




Opinion filed October 19, 2006

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                             No.
11-05-00101-CV 

                                                                    __________

 

                                                  MARILYN
PASCHAL, Appellant

 

                                                                            V.

 

                                GREAT WESTERN
DRILLING, LIMITED, Appellee

 



 

                                         On
Appeal from the 238th District Court

 

                                                        Midland County, Texas

 

                                                Trial
Court Cause No. CV 44,196

 



 

                                                                   O
P I N I O N

 








This appeal arises from a lawsuit filed by an
employer against the wife of a deceased employee in an attempt to recover a
large sum of money stolen by the employee. 
The employer sought to impose a constructive trust on the proceeds of
life insurance polices insuring the life of the deceased employee that named
the wife as beneficiary.  The employer
also sought to obtain a money judgment against the wife based upon allegations
that she conspired with her husband to steal the money.  Lastly, the employer asserted that the wife
committed the tort of conversion by collecting the proceeds of some of the life
insurance policies.  The jury made
findings in support of all of the causes of action asserted by the employer,
and the trial court entered a judgment that conformed with the jury=s verdict.  We affirm.

                                                               Background
Facts

Alan W. Paschal (Alan) worked as an accountant for
Great Western Drilling, Limited (Great Western) for over twenty years.  It is undisputed that he stole almost  $1,500,000 from Great Western between 1991
and 2003.  Alan committed the theft by
diverting the payment of revenue received by Great Western to AM & A Royalty,@ a fictitious royalty owner that he
created in Great Western=s
computer system.  Some of Alan=s coworkers discovered the theft in
June of 2003.  Alan died on June 23,
2003, as a result of a one-vehicle accident while he was trying to flee from an
FBI agent.

Alan deposited the checks that he issued to M
& A Royalty into an account that he maintained at Bank of America in Midland.  Great Western=s
accounting expert testified that Alan spent the stolen funds that he deposited
into the M & A Royalty account on living expenses, extremely large
purchases of jewelry, clothing and other ladies=
personal items, life insurance policies, mortgage payments, and hobbies
relating to horses and other livestock.  
The expert also noted numerous cash withdrawals from the M & A
Royalty account.  The M & A Royalty
account did not have a significant balance at the time of Alan=s death.

In June 2000, Alan began paying premiums on the
first of five Aterm@ life insurance policies that provided
death benefits in the total amount of $1,225,102.50 at the time of his death.  Each of the policies named his wife, Marilyn
Paschal (Marilyn), as the sole beneficiary. 
Alan paid all of the premiums for these policies from a joint account
that he and Marilyn maintained at the Midland Community Federal Credit
Union.  Alan periodically transferred
funds from the M & A Royalty account into the joint account.  He also deposited the salary that he received
from Great Western into the joint account. 
Great Western sought to impose a constructive trust on the life
insurance proceeds to the extent that Alan used the stolen funds to pay the
life insurance premiums.   The parties
presented extensive evidence in an effort to trace the portion of the stolen
funds which Alan used to the pay the premiums. 
The jury found that all of the premiums on four of the policies were
paid with funds that Alan stole from Great Western.[1]








 The jury
found that Alan owed a fiduciary duty to Great Western and that he breached
that duty by stealing funds from Great Western. 
The jury also determined that Alan committed fraud against Great
Western.  The jury found that Marilyn
engaged in a civil conspiracy with Alan to commit these acts and assessed
damages against her in the amount of $1,492,380.58 on the breach of fiduciary
duty claim and $990,079 on the fraud claim.

Great Western also alleged that Marilyn converted
a portion of the life insurance proceeds 
by obtaining payment of the policy benefits after Alan=s death.  The jury awarded Great Western damages in the
amount of $775,096 on the conversion claim.

Based on the jury=s
findings, the trial court entered judgment in favor of Great Western.   The trial court awarded Great Western
equitable relief by imposing a constructive trust on all of the insurance
proceeds remaining in Marilyn or her agents=
possession.  The trial court also entered
a money judgment against Marilyn in the amount of $1,492,380.58 on the
conspiracy claim.[2]  Lastly, the trial court awarded an additional
money judgment of $775,096 on the conversion claim.[3]  Marilyn raises ten issues on appeal attacking
the trial court=s
judgment. 

                                                     Preliminary
Procedural Matter

Marilyn alleges in her second, third, fourth,
fifth, sixth, seventh, and eighth issues that the trial court erred submitting
various questions in the court=s
charge. Tex. R. Civ. P. 278
requires the submission of jury questions that are supported by the written
pleadings and the evidence.  See Union
Pac. R.R. Co. v. Williams, 85 S.W.3d 162, 166 (Tex. 2002). 
A trial court may refuse to submit a question to the jury if (1) there
is no evidence; (2) there are no pleadings; or (3) the issue is uncontroverted.
 Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass=n, 710 S.W.2d 551, 555 (Tex. 1986).  








 An
objection to the submission of a question in the court=s
charge on evidentiary grounds is a challenge to the legal sufficiency of the
evidence.[4]   Elbaor v. Smith, 845 S.W.2d 240, 243
(Tex. 1992) (AA trial court may refuse to submit an
issue only if no evidence exists to warrant its submission@). 
While Marilyn bases her jury charge error issues on Ano-evidence@
grounds, she also asserts factual insufficiency grounds that there was Ano evidence, and alternatively,
insufficient evidence, to warrant the submission of said question.@ A party cannot base an objection to
the submission of an issue in the court=s
charge on factual sufficiency grounds because a party is entitled to the submission
of a question if there is some evidence to support the submission.  Kindred v. Con/Chem, Inc., 650 S.W.2d
61, 63 (Tex.
1983) (AThe
factual insufficiency of the evidence to support an affirmative answer to an
opponent=s issue
furnishes no basis for refusal to submit the issue@).  Accordingly, to the extent that Marilyn bases
her challenge to the submission of questions in the court=s charge on factual insufficiency
grounds, her second, third, fourth, fifth, sixth, seventh, and eighth issues
are overruled.  

                              Imposition
of Constructive Trust on Life Insurance Proceeds

Marilyn challenges the imposition of the
constructive trust in three of her appellate issues. 

In her first issue, Marilyn challenges the trial court=s ruling permitting Great Western=s accounting expert Harold Eldridge to
testify.  This issue relates to the
imposition of the constructive trust because a large part of Eldridge=s testimony focused on tracing the
funds used to pay the premiums on the life insurance policies.  In her tenth issue, Marilyn challenges the
factual sufficiency of the evidence supporting the jury=s
answers with respect to the source of the funds used to pay the premiums on
four of the policies.  Marilyn=s ninth issue addresses the trial court=s refusal to submit a question
pertaining to the payment of premiums on a life insurance policy issued by
Stonebridge Insurance Company. 

Applicable Law








The Fort Worth Court of Appeals addressed a
similar claim involving the payment of life insurance premiums with
misappropriated funds in Marineau v. Gen. Am. Life Ins. Co., 898 S.W.2d
397 (Tex.App.CFort
Worth 1995, writ denied).   An agent of a
life insurance company used funds that he stole from the company to purchase a
life insurance policy issued by the company. 
Id.
at 400.  The policy named his wife as the
beneficiary.  Id. 
The court held that, when an insurance policy=s
premiums are paid with funds fraudulently obtained, the beneficiary of the
policy holds the future proceeds from that policy in trust for the owner of the
defrauded funds. Id.
at 402.  The holding in Marineau
is consistent with the majority view of this area of insurance law:  

Where funds of another have been misappropriated
and used to purchase, or pay premiums on, life insurance, the courts will
generally allow the one whose funds were misused some form of recovery.
Generally, courts will impress either a constructive or a resulting trust on
the proceeds of life insurance, or a lien on the proceeds in favor of one whose
money was wrongfully used to pay premiums. 


 

Lee R. Russ & Thomas F. Segalla, Couch on Insurance '
74:37.

In Marineau, the court outlined the
applicable burdens of proof in a case of this type:  

A
plaintiff seeking to recover embezzled funds has the initial burden to trace
the embezzled funds into specific property. Once the plaintiff traces the
embezzled funds into specific property, that property becomes the subject of a
constructive trust.   If property is
purchased with funds from an account containing both embezzled funds and funds
belonging to the wrongdoer, that property is the subject of the trust, unless
the wrongdoer can prove that the subject property was purchased with the
wrongdoer=s own
funds, and not embezzled funds.

 

898 S.W.2d at 400 (citations omitted).  The culpability of the life insurance policy=s beneficiary is irrelevant because the
beneficiary has no greater rights in the policy=s
proceeds than did the policyholder.[5]  Couch,
Section 74:37.  As was the case in Marineau,
Marilyn acknowledges that Alan deposited stolen funds into an account from
which the life insurance policy premiums were paid.  Accordingly, the burden shifted to Marilyn to
prove that the premiums were paid, in whole or in part, with non-embezzled
funds.

Payment of Premiums








As noted previously, the five life insurance
polices provided for total benefits of $1,225,102.50.  Alan paid premiums on the five policies in the
total amount of $15,163.52 from the joint account that he and Marilyn
maintained at the Midland Community Federal Credit Union.  The premium payments were drafted on either a
monthly or quarterly basis.  From June
2000 through July 2003, Alan deposited $130,085.81 in salary that he received
from Great Western into the joint account. 
He also deposited $114,834 of funds that he stole from Great Western
into the joint account during this period. 
The jury determined the source of the funds used to pay the premiums on
four of the five policies.  The jury
found that all of the premiums on the four policies were paid with funds that
Alan stole from Great Western. 
Accordingly, the trial court imposed a constructive trust on all of the
funds remaining in existence from the life insurance proceeds.[6]

Expert Testimony

Great Western offered the testimony of Eldridge, a
certified public accountant, on various accounting issues.  Eldridge=s
testimony primarily addressed the matter of tracing the source of the funds
which Alan used to pay premiums on the life insurance policies.  Eldridge also offered testimony that analyzed
the parties=
financial records from the perspective of Marilyn=s
knowledge of Alan=s
embezzlement.  

Marilyn asserts in her first issue that the trial
court erred in determining that Great Western established the reliability of
Eldridge=s expert
testimony under the requirements of Daubert v. Merrill Dow Pharm., Inc.,
509 U.S. 579 (1993), and E.I. du Pont de Nemours & Co. v. Robinson,
923 S.W.2d 549, 556 (Tex. 1995).  The
Texas Supreme Court recently addressed the Daubert/Robinson  requirements in Cooper Tire & Rubber
Co. v. Mendez, 49 Tex. Sup. Ct. J. 751, 2006 WL 1652234, at *2-*3 (Tex. June 16,
2006).  In Cooper, the court
stated:

Expert testimony is admissible if (1) the expert
is qualified, and (2) the testimony is relevant and based on a reliable
foundation. If the expert=s
scientific evidence is not reliable, it is not evidence.  The trial court=s
determination that these requirements are met is reviewed for abuse of
discretion. The test for abuse of discretion is whether the trial court acted
without reference to any guiding rules or principles.  Admission of expert testimony that does not
meet the reliability requirement is an abuse of discretion. 

 








In deciding whether an expert is qualified, the
trial court must ensure that those who purport to be experts truly have
expertise concerning the actual subject about which they are offering an
opinion.  Scientific testimony is
unreliable if it is not grounded in the methods and procedures of science, and
amounts to no more than a subjective belief or unsupported speculation.  We have also recognized that expert testimony
is unreliable if there is simply too great an analytical gap between the data
and the opinion proffered.  We are
not required . . . to ignore fatal gaps in an expert=s
analysis or assertions that are simply incorrect.  A flaw in the expert=s
reasoning from the data may render reliance on a study unreasonable and render
the inferences drawn therefrom dubious. Under that circumstance, the expert=s scientific testimony is unreliable
and, legally, no evidence.

 

In Robinson, we identified six factors that trial courts
may consider in determining whether expert testimony is reliable:

 

1. the extent to which the theory has been or can
be tested;

 

2. the extent to which the technique relies upon
the subjective interpretation of the expert;

 

3. whether the theory has been subjected to peer
review and/or publication;

 

4. the technique=s
potential rate of error;

 

5. whether the underlying theory or technique has
been generally accepted as valid by the relevant scientific community; and

 

6. the non‑judicial uses which have been
made of the theory or technique.

 

We
emphasized in Robinson that these factors are non‑exclusive and
that [Tex. R. Evid.] 702
contemplates a flexible inquiry.

 

In [Gammill v. Jack Williams Chevrolet, Inc.,
972 S.W.2d 713, 726 (Tex.
1998)], we recognized that the Robinson factors cannot always be
used in assessing an expert=s
reliability, but there must be some basis for the opinion offered to show its
reliability. We further made clear in Gammill that the Robinson
relevance and reliability requirements apply to all expert testimony.

 








The trial court is not required to admit opinion
evidence which is connected to existing data only by the ipse dixit of
the expert. If the expert brings only his credentials and a subjective opinion,
his testimony is fundamentally unsupported and therefore of no assistance to
the jury. [Rule 702], by its terms, only provides for the admission of expert
testimony that actually assists the finder of fact.[7]  

 

2006 WL 1652234, at *2-*3 (citations and quotations omitted).

At Marilyn=s
request, the trial court conducted a lengthy hearing outside of the jury=s presence regarding the reliability of
Eldridge=s
proposed testimony.  Marilyn primarily
directed her challenge to the tracing method that Eldridge used in tracing the
source of funds that Alan used in paying the premiums on the life insurance
policies.  Eldridge testified about the
accounting standards and publications upon which he relied to select the tracing
method that he used.  He also used an
article written by an attorney which addressed the characterization and tracing
of marital property in Texas.  Eldridge testified that there were no
accounting rules directly related to the tracing and apportionment of assets
purchased with embezzled funds that have been commingled with other funds.

Eldridge concluded that the Afamily expense method@ was the most equitable method for
determining the source of the funds used to pay the premiums.  As applied by Eldridge, the family expense
method is a theoretical approach to tracing. 
It is based on the premise that Alan=s
salary was used first for the payment of the family=s
living expenses prior to paying for any other expenses.  As noted previously, Alan deposited
$130,085.81 of his salary into the joint account from June 2000 through July
2003.[8]  Eldridge determined that $223,188.26 in
family expenses were paid from the joint account during this period.[9]  Since the family=s
living expenses exceeded Alan=s
salary, Eldridge concluded that the embezzled funds which Alan deposited into
the joint account constituted the source of the funds for all other
expenditures from the account, including the payment of the life insurance
proceeds.  








Marilyn asserts that the family expense method is
an invalid method for tracing deposits and withdrawals from a bank account
because it has not been used by Texas
courts in the marital property context. 
In advancing this argument, Marilyn equates Alan=s
salary with community property and the stolen funds with separate property.  Relying on family law cases, she argues that
the Acommunity
out first@
presumption should be applied to this situation.  See Welder v. Welder, 794 S.W.2d 420,
433 (Tex. App.CCorpus
Christi 1990, no writ) (When separate property and community property are
commingled in a single bank account, we presume that the community funds are
drawn out first before separate funds are withdrawn).  

We disagree with Marilyn=s
argument that the principles of tracing which have been applied in the marital
property context are applicable to the tracing of embezzled funds that have
been commingled with other funds.  The motives
of an embezzler are likely quite different than those of a spouse in the
possession of both separate and community funds.  Section 211 of the Restatement of Restitution
recognizes this distinction.  Restatement (First) of Restitution ' 211 (1937). Section 211(1) provides: AWhere a person wrongfully mingles money
of another with money of his own and subsequently makes withdrawals from the
mingled fund, the other is entitled to an equitable lien upon the part which
remains and the part which is withdrawn or upon their product.@ 
The comment to Subsection (1) states: 

It is immaterial in what order the deposits were
made, whether the money of the claimant was first deposited or the wrongdoer=s individual money.  There is no inference that the money first
deposited is the money first withdrawn. 
The rule . . . that withdrawals are presumed to be in the same order as
that in which the deposits were made, has no application to this situation
where a deposit is made by a wrongdoer. 
That rule is applicable only to situations where the intention of the
depositor is controlling.  

 

So also, there is no inference that the wrongdoer
withdraws his own funds first, nor is there an inference that he withdraws the
claimant=s funds
first. . . .  When he withdraws a part,
he withdraws funds on which the claimant has a lien, and he leaves a balance on
which the claimant also has a lien.

 

Thus, the Restatement rejects an application of the Acommunity out first@ presumption in this case.








Eldridge testified that there are multiple methods
that could be used to trace the funds that Alan used to pay the insurance
premiums.[10]
He utilized the family expense method because he believed it was the most
equitable.  When one considers the fact
that Alan=s family
expenses greatly exceeded his salary, the application of the family expense
method is reasonable.  Furthermore, the
family expense method does not contradict the view expressed in the Restatement
because it does not depend upon an analysis of the sequence in which deposits
and withdrawals were made.  Accordingly,
we conclude that Eldridge=s
reliance on the family expense method was not improper.  

Marilyn argues that Eldridge misapplied the family
expense method because he did not include the insurance premiums as a family
expense.  She bases this argument on the
fact the family district court in Midland
classifies the payment of life insurance premiums as a Amonthly
expense@ on its AFinancial Information Statement@ that spouses fill out in divorce
proceedings.  We reject Marilyn=s argument that the financial
information statement is controlling on this issue.  The purpose of that statement is to provide
the trial court with information about the spouses=
finances at the outset of the divorce. 
It is not applicable to a situation where one is attempting to trace the
source of payments in the case of commingled, embezzled funds.  

We conclude that the trial court did not abuse its
discretion by overruling Marilyn=s
challenge to Eldridge=s
testimony under Daubert and Robinson.  Eldridge offered extensive testimony
regarding the accounting methods that he used in forming his opinions and the
basis for these opinions.  The record
does not reflect that the trial court acted without reference to guiding rules
or principles in permitting Eldridge to testify.  We note in this regard that the testimony of
a CPA regarding the analysis of financial records does not seem to be the type
of expert testimony which the six factors outlined in Robinson would be
particularly helpful in assisting the trial court to determine the reliability
of the expert=s
proposed testimony.  Instead, the Ageneral reliability@ test set out in Gammill would
appear to be more appropriate.  972
S.W.2d at 726.  Marilyn=s first issue is overruled.

Source of Funds Used to Pay Insurance Premiums

As noted previously, the jury determined that all
of the premiums for four of the policies were paid with funds that Alan stole
from Great Western.  Marilyn attacks the
factual sufficiency of the evidence supporting the jury=s
answers in her tenth issue.  A party
attacking the factual sufficiency of an adverse finding on an issue on which it
has the burden of proof must demonstrate on appeal that the adverse finding is
against the great weight and preponderance of the evidence. Dow Chem. Co. v.
Francis, 46 S.W.3d 237, 241 (Tex.
2001). 








Marilyn premises her tenth issue in part on her
first issue where she alleges that the trial court erred in permitting Eldridge
to offer his opinion on tracing.  She
contends that Eldridge=s
testimony should be ignored because the trial court should not have permitted
him to testify.  She further argues that,
in the Aabsence@ of Eldridge=s
testimony, the only credible evidence on the issue of tracing was offered by
her accounting expert Ken Huff.  Huff
conducted a line-item analysis of the joint account=s
deposits and withdrawals to determine the source of funds for each insurance
premium payment.  Based upon his
calculations, he apportioned $761,830 of the insurance proceeds to Marilyn and
$363,266 to Great Western.

We disagree with Marilyn=s
contention that the jury=s
apportionment was against the great weight and preponderance of the
evidence.  We have determined that the
trial court did not err in permitting Eldridge to testify and that Eldridge=s method of tracing was not
improper.  Thus, there was evidence which
supported the jury=s
answers.  Marilyn=s
evidence to the contrary was not so overwhelming as to render the jury=s verdict manifestly unjust.  Huff=s
method of analysis required mathematical accuracy on his part in the sequencing
of the joint account=s
deposits and withdrawals.  Huff
acknowledged on cross-examination that there were instances in his calculations
where the computer program that he used did not sort the deposits and
withdrawals in the correct order. Moreover, Huff=s
method of tracking conflicts with the Restatement because his calculations
depended on the sequencing of deposits and withdrawals.  Marilyn=s
tenth issue is overruled.

Omitted Policy

Marilyn argues in her ninth issue that the trial
court erred in refusing to submit an apportionment question in the court=s charge regarding the Stonebridge
policy.  The standard for review of an
allegation of jury charge error is an abuse of discretion. Tex. Dep=t of Human Servs. v. E.B., 802
S.W.2d 647, 649 (Tex.
1990).  We indulge all inferences in
favor of the submission. Kindred, 650 S.W.2d at 63.  In determining whether a trial court should
have submitted a question to the jury, the reviewing court must examine the
record for evidence supporting submission and ignore all evidence to the
contrary.  Elbaor, 845 S.W.2d at
243.             Great
Western objected to Marilyn=s
attempt to offer Huff=s
opinion about the Stonebridge policy on the ground that Marilyn did not timely
provide the opinion during discovery.  In
response to the objection, the trial court instructed Marilyn=s counsel as follows: A[D]on=t
go into an opinion on Stonebridge until we resolve this issue.@ 
It does not appear that the trial court revisited the issue of the
Stonebridge policy until Great Western sought a partial directed verdict on the
Stonebridge policy after the close of evidence. 
In denying Great Western=s
request, the trial court stated: AI
believe there=s
underlying evidence in the record that could support [it].@ 
However, the trial court subsequently denied Marilyn=s request for an apportionment question
on the Stonebridge policy. Marilyn
contends that there was evidence regarding the payment of the Stonebridge
policy in a 107-page section of Huff=s
report detailing each one of the 3,921 transactions occurring with the joint
account from January 2000 until July 2003. 
While Huff=s raw
data includes the eleven payments of 
premiums on the Stonebridge policy, he did not highlight these payments
in green ink like he did the payments on the other policies.  Furthermore, Huff did not include a summary
for the payment of premiums on the Stonebridge policy as he did with the other
four policies.  In light of these
omissions in Huff=s written
report and the trial court=s
ruling forbidding Marilyn from introducing evidence about the Stonebridge
policy, we conclude that the trial court did not abuse its discretion in
refusing to submit an apportionment question for the Stonebridge policy.  Marilyn=s
ninth issue is overruled.

                                                                 Civil
Conspiracy








Marilyn=s
second, third, fourth, fifth, and sixth issues address the conspiracy causes of
action.  An actionable civil conspiracy
is a combination by two or more persons to accomplish an unlawful purpose or to
accomplish a lawful purpose by unlawful means. 
Massey v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983). The essential elements of a
civil conspiracy are (1) two or more persons; (2) an object to be accomplished;
(3) a meeting of the minds on the object or course of action; (4) one or more
unlawful, overt acts; and (5) damages as the proximate result. Juhl v.
Airington, 936 S.W.2d 640, 644 (Tex.
1996); Triplex Commc=ns,
Inc. v. Riley, 900 S.W.2d 716, 719 (Tex.
1995).  It is not the agreement itself
but an injury to the plaintiff resulting from an act done pursuant to the
common purpose that gives rise to a cause of action for civil conspiracy. Carroll
v. Timmers Chevrolet, Inc., 592 S.W.2d 922, 925 (Tex. 1979). 
In other words, recovery is not based on the conspiracy but on an
underlying tort. Tilton v. Marshall, 925
S.W.2d 672, 681 (Tex.
1996).  Thus, a conspiracy claim is a
derivative tort.  Id.  
Great Western alleged breach of fiduciary duty and fraud causes of
action as underlying torts to support its conspiracy claims against
Marilyn.   The torts of fraud and breach
of  fiduciary duty have been recognized
as causes of action that will support a civil conspiracy claim.  See Lesikar v. Rappeport, 33 S.W.3d 282,
302 (Tex. App.CTexarkana
2000, pet. denied). 

Breach of Fiduciary Duty

Marilyn asserts in her fourth issue that the trial
court erred in submitting a question in the court=s
charge that asked if a fiduciary relationship existed between Alan and Great
Western.[11]  She initially argues that the issue of
whether Alan owed a fiduciary duty to Great Western is a question of law.  We disagree. 
In certain formal relationships, such as an attorney-client or trustee
relationship, a fiduciary duty arises as a matter of law. Johnson v. Brewer
& Pritchard, P.C., 73 S.W.3d 193, 199 (Tex. 2002). 
Texas
courts have also recognized that certain informal relationships may give rise
to a fiduciary duty.   Crim Truck
& Tractor Co. v. Navistar Int=l
Transp. Corp., 823 S.W.2d 591, 594 (Tex.
1992).  The existence of an
informal, confidential relationship is usually a question of fact.  Id.  Since Alan did not have a formal relationship
with Great Western that has been recognized as giving rise to a fiduciary duty
as a matter of law, the issue of whether he had a confidential relationship with
Great Western was a question of fact.

Marilyn also asserts in her fourth issue that
there was no evidence to support the submission of a question that asked if a
fiduciary relationship existed between Alan and Great Western.  She begins her evidentiary analysis by
discussing evidence which was contrary to a finding that Alan owed a fiduciary
duty to Great Western.  We must disregard
this evidence, however, because we must limit our review of the record to only
the evidence supporting the claim that Alan had a fiduciary relationship with
Great Western.  Elbaor, 845 S.W.2d
at 243. 








Alan worked as a senior revenue accountant for
Great Western.  He was in charge of
disbursing revenue received by Great Western to the various working interest
and royalty interest owners who owned interests in the leases that Great
Western operated.  Alan performed this
task by periodically setting up the list of payees and their respective payment
amounts in Great Western=s
computer system.  He subsequently printed
out the checks to be issued by Great Western and forwarded them to someone else
for mailing to the appropriate payees. 
No other official at Great Western examined the checks that Alan printed
out prior to their delivery to the payees.[12]

The term Afiduciary@ generally applies Ato any person who occupies a position
of peculiar confidence towards another.@  Kinzbach Tool Co. v. Corbett-Wallace
Corp., 160 S.W.2d 509, 512 (Tex.
1942).  The responsibilities that Great
Western assigned to Alan to distribute millions of dollars of revenue to the
appropriate recipient is some evidence that he occupied a position of peculiar
confidence toward Great Western and owed Great Western a fiduciary duty.  Accordingly, the trial court did not abuse
its discretion in submitting a question to the jury regarding Alan=s status as a fiduciary.  Marilyn=s
fourth issue is overruled.

In her fifth issue, Marilyn contends that the
trial court erred in submitting a question in the court=s
charge regarding the damages caused by Alan=s
breach of fiduciary duty.[13]  She argues that  the trial court abused its discretion by
submitting this issue because it required the jury to assess damages based upon
the conduct of a non-party.  We
disagree.  While neither Alan nor his estate
was a party before the trial court, Great Western alleged that Alan and Marilyn
were a part of a conspiracy that harmed Great Western.  Once a conspiracy is proven, each conspirator
is responsible for all acts done by any of the conspirators in furtherance of
the conspiracy. Carroll, 592 S.W.2d 
at 926.  Since the charge
conditioned the jury=s
consideration of the damage question on an affirmative finding that Marilyn was
part of a conspiracy that damaged Great Western, the trial court did not err in
submitting a damage question regarding the damages caused to Great Western by
Alan=s breach
of fiduciary duty.[14]  Marilyn=s
fifth issue is overruled.

Fraud 

Marilyn=s
third and sixth issues relate to the fraud cause of action.  She alleges in her sixth issue that the trial
court erred in submitting a question which asked the jury if Alan committed
fraud against Great Western because there was no evidence to justify submitting
this issue to the jury.  In her third
issue, Marilyn argues that there was no evidence to support the submission of a
question that asked the jury to determine Great Western=s
damages caused by her fraud.  She
additionally argues in her third issue that the fraud damage question was not
supported by proper pleadings and that the manner in which the question was
worded constituted an improper comment on the weight of the evidence.   As noted previously, the trial court did not
award any damages to Great Western on the fraud claim because the damages
awarded for the breach of fiduciary duty claim were greater.[15]  Accordingly, we do not consider Marilyn=s third and sixth issues because they
are not necessary to the final disposition of the appeal.  Tex.
R. App. P. 47.1.  

Submission of Conspiracy Liability Questions 








Marilyn asserts in her second issue that the trial
court erred in submitting three questions in the court=s
charge which asked if she was part of a conspiracy that damaged Great Western.[16]  She first contends that Great Western did not
have sufficient pleadings to support their submission.  Secondly, Marilyn challenges the legal
sufficiency of the evidence supporting the submission of these questions.

While Marilyn alleges a pleading deficiency in
stating her second issue, she does not present any argument or cite any
authority in support of this contention in her brief as required by  Tex. R.
App. P. 38.1(h).  Accordingly,
Marilyn has waived this issue for appellate consideration.  We note in this regard that Great Western=s pleadings contained extensive
allegations regarding its attempt to impose liability against Marilyn for civil
conspiracy.

Marilyn focuses her legal insufficiency contention
on the Ameeting
of the minds@ element
of a conspiracy cause of action.  She
cites the various places in the record where she denied having any knowledge
that Alan was stealing money from Great Western.  While Marilyn acknowledged that  she was aware that Alan had made large
purchases of jewelry, she denied knowing the source of the funds for these
purchases.  She also emphasizes that she
had no knowledge of or participation in the manner in which Alan carried out
the theft of funds from Great Western.

Marilyn argues that the holding in Schlumberger
Well Surveying Corp. v. Nortex Oil & Gas Corp., 435 S.W.2d 854 (Tex. 1968), is
controlling in this case.  Schlumberger
involved Aslant
hole@ oil
wells that were bottomed beyond lease lines such that they were illegally
producing oil from neighboring leases. 
435 S.W.2d at 855.  As a well
servicing company that worked on the wells drilled by others, Schlumberger had
knowledge that the wells in question deviated from a normal vertical
course.  Id. at 856.  Furthermore, Schlumberger took steps to
protect its customers who might be subjected to investigation for drilling
illegally deviated wells.  Id.  

The subsequent purchaser of the wells in question
alleged that Schlumberger conspired with the sellers of the wells to commit
fraud based upon Schlumberger=s
knowledge that the wells were slant hole wells. 
Id.
at 855-56.  The Texas Supreme Court
determined that there was no evidence to support a conspiracy finding because
there was no basis upon which one could reasonably infer that Schlumberger had
knowledge of the object of the conspiracy or an intention to injure adjoining
owners.  As stated by the court:








For purposes of this opinion, we may assume that
Schlumberger had good reason to believe that the conspiracy existed as alleged
by Nortex, and that the existence and object of the conspiracy could have been
discovered by Schlumberger by the exercise of the slightest degree of
diligence.  We are unwilling to say,
however, that the evidence will support a reasonable inference that
Schlumberger had actual knowledge that the four particular wells had been or
were to be bottomed under adjoining or adjacent leases for the purpose of
producing oil owned by others, or that Schlumberger intended to participate in
any such wrong.

 

Id.
at 857.  Marilyn cites Schlumberger
for the proposition that evidence that she may have had Agood
reason to believe@ that
Alan stole funds from Great Western is insufficient to support the submission
of a conspiracy issue to the jury.

As noted by the court in Schlumberger,
proof of a conspiracy must usually be made by circumstantial evidence.  Id.
at 858.  The court addressed this subject
in the early case of Jernigan v. Wainer, 12 Tex. 189, 193 (1854), wherein the court
stated:  

When
men enter into conspiracies, they are not likely to call in a witness. They
resolve their schemes clandestinely and in secret. Their purpose is imposition
and deception; and secrecy is necessary to its accomplishment. In such cases
the injured party must necessarily have recourse to circumstantial
evidence.  For it is only by the
inferences and deductions which men properly and naturally draw from the acts
of others in such cases, that their intentions can be ascertained. They are not
likely to proclaim them in the hearing of witnesses.

 

The general rule is that conspiracy liability is sufficiently
established by proof showing concert of action or other facts and circumstances
from which the natural inference arises that the unlawful, overt acts were
committed in furtherance of common design, intention, or purpose of the alleged
conspirators.  Int'l Bankers Life Ins.
Co. v. Holloway, 368 S.W.2d 567, 581 (Tex. 1963). 
It is not required that each and every act of a conspirator be shown to
have been in concert with the others or that it be established by direct
evidence that all combined at a given time prior to each transaction.  Id.
at 582.   Inferences of concerted action
may be drawn from joint participation in the transactions and from enjoyment of
the fruits of the transactions.  Id.

There is abundant 
evidence that Marilyn enjoyed the fruits of Alan=s
theft.  For example, the couple purchased
$116,637.90 in ladies=
jewelry from a single jewelry store between July 2000 and June 2003.  During the first half of 2003, the couple
purchased mail order items from an entity called AShop
NBC@ in the amount of $91,870.93.








 At the time
these purchases were made, the couple only reported annual gross wages of
approximately $50,000 on their joint tax returns.[17]  After deducting losses from their horse
operation, the couple reported adjusted gross income of $37,920, $40,516, and
$36,947 for 2000, 2001, and 2002. 
Eldridge testified that the income listed on the couples= tax returns would have only provided
them with disposable income of approximately $12,000 a year during this period
after deducting medical expenses, home expenses, and charitable
contributions.  Eldridge concluded that AMarilyn Paschal had knowledge that Alan
Paschal was obtaining substantial funds from some source that could have likely
only come from his embezzlement.@


Alan and Marilyn executed a document entitled AMarital Contract@
on June 30, 2000.  The document provided
as follows:

                                              MARITAL
CONTRACT

 

WHEREAS, ALAN PASCHAL and MARILYN PASCHAL desire
to enter into written agreement, respecting certain obligations financially for
themselves; 

 

WHEREAS, by such contractual arrangements, it is
expected that they will minimize and curtail disputes or disagreements
respecting such obligation, in order to have a more harmonious relationship;

 

NOW, THEREFORE in consideration of the
above-described premises, ALAN PASCHAL and MARILYN PASCHAL do hereby agree as
follows:

 

As an incentive to be faithful and not to mentally
or physically abuse MARILYN PASCHAL, ALAN PASCHAL will meet the following
financial obligations, even though the parties may terminate their marital
relationship by divorce:

 

(1)        ALAN PASCHAL will pay the mortgage payments on the family
house which they occupy as the marital homeplace, including any ad valorem,
insurance and other charges for the maintenance and preservation of such home, including
but not limited to the insurance, whether the same be as a direct payment, or
as an additional amount paid into escrow, along with the monthly payment of
principal and interest;

 

(2)        ALAN PASCHAL will pay for the feed and other reasonable
maintenance necessary for the animals maintained at the homeplace;








 

            (3)        ALAN PASCHAL will maintain a life
insurance policy in the amount of at least $1,000,000.00 with MARILYN PASCHAL
as the beneficiary.

 

            (4)        ALAN PASCHAL will also give MARILYN PASCHAL
the sum of $500.00 a month in addition to the other payments called for in this
contract and shall pay all medical expenses for MARILYN PASCHAL as such medical
expenses become necessary to properly care for her health and welfare.

 

            (5)        ALAN PASCHAL will pay for all reasonable
expenses and maintenance necessary to maintain the residence in Item No. 1.

 

            (6)        ALAN PASCHAL will pay all current credit
card debts owed by the parties or either of them.

 

Marilyn testified that the purpose of this document was to
protect her and her family financially. 
She testified that Alan had been involved in several automobile
accidents and that she was worried that he would be unable to work in the
future.  Marilyn also testified she
planned to try to get pregnant by in vitro fertilization.  When asked what she was required to do under
the contract, Marilyn replied: AI
wasn=t
required to do anything except, the way the doctors put it, risk my life to
become pregnant.@  Marilyn also testified that the marital
contract was inspired by her discovery in April 1999 that Alan had been
unfaithful to her.

The execution of this marital contract in June
2000 coincided with Alan=s
first payment of a premium on the first life insurance policy that he
purchased.  It also coincided with the
first purchase of jewelry in July 2000. 
Additionally, the amount of money which Alan stole from Great Western
increased significantly after the execution of the document.   In the 102-month period from January 1992
through June 2000, Alan stole $490,784.90 from Great Western for a monthly average
of $4,811.60.[18]  In the 36-month period from July  2000 through June 2003, Alan stole
$990,079.06 from Great Western for a monthly average of $27,502.20. 








The circumstances in this case are substantially
different from the circumstances in Schlumberger. The alleged
conspirators in Schlumberger were independent entities who presumably
were dealing with each other in arms‑length transactions entered into for
the parties= mutual
benefit.  The alleged conspirators in
this case were husband and wife. 
Furthermore, there was no evidence in Schlumberger that the
target defendant received any ill-gotten gains as a result of the alleged
conspiracy.  435 S.W.2d at 857.  As noted previously, Marilyn obviously
enjoyed the fruits of Alan=s
theft.  

We conclude that there was evidence which supports
an inference that Marilyn had actual knowledge that Alan was stealing large
sums of money from Great Western.  Alan
injected several thousands of dollars a month into the family=s finances which greatly exceeded the
amount of the wages which he and Marilyn reported to the IRS.  The large amount of money that Alan
embezzled, coupled with the absence of any other possible source for this
windfall, is evidence which supports an inference that Marilyn had actual
knowledge that Alan embezzled the funds from his employer in his role as a
revenue accountant for Great Western. 
The unusual circumstances surrounding the marital contract that Alan and
Marilyn executed strengthens the inference of concerted action on their part.  Marilyn=s
second issue is overruled.

                                                                     Conversion

Marilyn asserts in her seventh issue that the
trial court erred in submitting questions to the jury on Great Western=s conversion claim.  The jury found that she converted life insurance
proceeds paid by Cuna Mutual Life Insurance Company, Stonebridge Life Insurance
Company, and U.S. Financial Life Insurance Company in the amount of
$775,096.  Attorney Bill Bowden assisted
Marilyn in obtaining payment of these insurance proceeds soon after Alan=s death.  Bowden delivered a check to Marilyn on
September 16, 2003, in the amount of $732,614.15.  She immediately paid $250,000 of this amount
to trial counsel to represent her in the lawsuit.  On September 24 and 26, 2003, she spent
$450,000 to purchase two annuities from General Electric Capital Assurance
Company.








A conversion occurs when one person makes an
unauthorized, wrongful assumption and exercises dominion and control over the
personal property of another to the exclusion of or inconsistent with the owner=s rights. Waisath v. Lack=s Stores, Inc., 474 S.W.2d 444, 447
(Tex.
1971).  Marilyn asserts that the evidence
did not support a claim for conversion. 
She first argues that the proceeds of life insurance policies are not
capable of being converted.  Marilyn also
contends that, since she was the named beneficiary of the policies, Great
Western did not have a superior right in the policies=
proceeds which would support a claim for conversion.  

Money is subject to conversion only when it can be
identified as a specific chattel and not where an indebtedness may be
discharged by the payment of money generally. 
See Newsome v. Charter Bank Colonial, 940 S.W.2d 157, 161 (Tex.
App.CHouston
[14th Dist.] 1996, writ denied); Estate of Townes v. Townes, 867 S.W.2d
414, 419 (Tex. App.CHouston
[14th Dist.] 1993, writ denied).  An
action for conversion of money will only lie where the money is (1) delivered
for safekeeping; (2) intended to be kept segregated; (3) substantially in the
form in which it is received or an intact fund; and (4) not the subject of a
title claim by its keeper.  Newsome,
940 S.W.2d at 161.  In addressing another
issue, the court in Marineau stated: AThe
right to receive insurance proceeds payable at a future but uncertain date is >property.=  Such property is said to be in the nature of
a chose in action which matures at the death of the insured.@ 
898 S.W.2d at 402.  The critical
inquiry in this case is whether the maturation of the policies that occurs when
the insured dies transforms the policies=
proceeds into an indebtedness that may be discharged by the payment of
money.  

Under the facts of this case, we conclude that the
policy proceeds remained property subject to conversion.  The jury determined that the beneficiary of
the life insurance policies conspired with the insured to wrongfully obtain the
funds used to pay all of the premiums on the life insurance policies.   Furthermore, the policies were purchased
pursuant to the terms of a contract between the insured and the beneficiary.  Marilyn was required to hold the policies and
their proceeds in trust for the benefit of Great Western.  Id.
at 402-03.  Marilyn wrongfully exercised
dominion and control over the proceeds when she used the funds for her own
benefit rather than preserving them for Great Western.  To hold otherwise would permit a
coconspirator to profit from her wrongdoing.

Marilyn also contends that there was no evidence
to support a recovery because there was no evidence that Great Western suffered
a loss from her acts.  A plaintiff must
prove damages before recovery is allowed for conversion. United Mobile
Networks, L.P. v. Deaton, 939 S.W.2d 146, 147 (Tex. 1997). Generally, the measure of
damages for conversion is the fair market value of the property at the time and
place of conversion. Id.  Great Western suffered a loss from Marilyn=s conversion of the policy proceeds
because she withheld them for her own use rather than delivering them to Great
Western.








Lastly, Marilyn argues that there was no evidence
that Great Western made a demand for the policy proceeds which she refused.  ADemand@ and Arefusal@ are sometimes listed as elements in a
conversion claim.  See Apple Imps., Inc.
v. Koole, 945 S.W.2d 895, 899 (Tex. App.CAustin
1997, writ denied).  These elements are
particularly important when the conversion claim arises from a bailment
relationship.  See Presley v.
Cooper, 284 S.W.2d 138, 141 (Tex.
1955). The demand and refusal elements of conversion are not required if other
evidence establishes an act of conversion. 
Id.  These elements are not applicable in this
case because Marilyn=s
disposition of the policy proceeds to the exclusion of Great Western=s rights in them established an act of
conversion.  Marilyn=s seventh issue is overruled.  

                                                   Submission
of Damage Questions

In her eighth issue, Marilyn asserts that
the trial court erred in submitting three damage questions in the court=s charge.  These questions included the damage questions
for the breach of fiduciary duty claim, the fraud claim, and the conversion
claim.  She contends that there was no
evidence to support an award of damages on these claims.[19]  As previously noted, the trial court did not
base an award of damages to Great Western on the fraud cause of action.  Accordingly, we do not address Marilyn=s challenge to the submission of the
damage question on the fraud cause of action. 
Rule 47.1. 








Marilyn premises her no evidence claim on the
contention that Eldridge=s
testimony was the only evidence that supported these damage awards and that his
testimony in these areas was unreliable. 
We have previously determined that the trial court did not err in
overruling Marilyn=s objection
to the reliability of Eldridge=s
testimony.  With respect to the jury=s damage award on the breach of
fiduciary duty claim, the evidence is undisputed that Alan stole at least $1,492,380.58
from Great Western.  It is well-settled
law that, upon joining a conspiracy, a defendant becomes a party to every act
previously or subsequently committed by any of the other conspirators in
pursuit of the conspiracy.  State v.
Standard Oil Co., 107 S.W.2d 550, 560 (Tex. 1937). 
Accordingly, the extent that Alan may have stolen some of these funds
prior to Marilyn=s
participation  in the conspiracy is
irrelevant because she became liable for his previous acts when she joined the
conspiracy.  Additionally, the amount of
policy proceeds she obtained after Alan=s
death was also undisputed.  Marilyn=s eighth issue is overruled.

                                                               This
Court=s Ruling

The judgment of the trial court is affirmed in all
respects.

 

TERRY McCALL

JUSTICE

 

October 19, 2006

Panel consists of:  Wright,
C.J., and McCall, J.  

McCloud, S.J., not participating.[20]











[1]The trial court refused to submit a question to the
jury regarding the payment of the premiums on one of the policies.  We address the trial court=s refusal to submit a question regarding this policy in
our discussion of Marilyn=s ninth issue.





[2]The breach of fiduciary duty claim and the fraud claim
were alternative theories of recovery by which Great Western sought to impose
liability against Marilyn for civil conspiracy. 
Since the damage award for the breach of fiduciary duty claim was
greater, the trial court entered judgment based upon this amount.





[3]The judgment provides that any sums which Great Western
obtains as a result of the constructive trust are to be credited against the
money judgment imposed against Marilyn.





[4]ANo-evidence@ points
may be raised by (1) a motion for instructed verdict, (2) a motion for judgment
notwithstanding the verdict, (3) an objection to the submission of the issue to
the jury, (4) a motion to disregard the jury=s answer
to a vital fact issue, or (5) a motion for new trial.  Aero Energy, Inc. v. Circle C Drilling
Co., 699 S.W.2d 821, 822 (Tex.
1985). 





[5]AA beneficiary, or any innocent taker except a bona fide
purchaser, has no greater rights than the insured had in the proceeds.  Therefore, a beneficiary may be held to
account as a constructive trustee in the same manner and to the same extent as
the insured for misappropriated funds used to pay premiums.@  Couch, Section 74:37.





[6]Since Marilyn had the burden of proving that
non-embezzled funds were used to pay the premiums on the policies, the
constructive trust imposed by the trial court included the fifth policy issued
by Stonebridge Insurance Company even though the jury did not determine the
source of the funds that were used to pay its premiums.





[7]Tex. R. Evid. 702 provides: AIf
scientific, technical, or other specialized knowledge will assist the trier of
fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or education
may testify thereto in the form of an opinion or otherwise.@





[8]The joint account had a balance of only $944.04 on June
1, 2000.





[9]Eldridge did not include the payment of life insurance
premiums as a family expense.





[10]The accounting expert in Marineau also testified
that there were several possible methods for tracing insurance premiums paid in
part with misappropriated funds.  898
S.W.2d at 403.





[11]The question read as follows: 

 

Did a relationship of trust and confidence exist
between Alan Paschal and Great Western?  

 

Instruction:
You are instructed that a relationship of trust and confidence, commonly
referred to as a Afiduciary relationship@ existed
if Great Western justifiably placed trust and confidence in Alan Paschal to act
in Great Western=s best interest.





[12]The checks were not signed by an actual person because
the signature of Great Western=s president was pre-printed on the checks.





[13]The question read as follows:

 

What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate Great Western for its damages, if any, that were
proximately caused by Alan Paschal=s breach
of fiduciary duty?  





[14]Marilyn challenges the submission of questions
regarding her liability as a conspirator. 
We address this challenge in a subsequent portion of the opinion.





[15]See Footnote No. Two.





[16]Specifically, Marilyn challenges the submission of
Questions Nos. Three, Eight, and Ten in the court=s
charge.  Questions Nos. Three and Eight
were identical.  They asked the jury as
follows: 

 

Was Marilyn Paschal part of a conspiracy that damaged
Great Western?  

 

Instruction: To be part of a conspiracy, Marilyn
Paschal and another person or persons must have had knowledge of, agreed to,
and intended a common objective or course of action that resulted in the
damages to Great Western.  One or more
persons involved in the conspiracy must have performed some act or acts to
further the conspiracy.  

Question
No. Three followed the question that asked the jury if Alan breached a
fiduciary duty owed to Great Western. 
Question No. Eight followed the question that asked if Alan committed
fraud against Great Western.  Since the
trial court did not award any damages to Great Western on the fraud claim, we
do not consider her challenge to Question No. Eight.  Rule 47.1. 


 

Question No. Ten was conditioned on an affirmative
answer to Question No. Eight.  It asked
the jury to determine if it found by clear and convincing evidence that Great
Western suffered harm from the conspiracy to commit fraud.  Thus, Question No. Ten served the purpose of
possibly enabling Great Western to obtain a recovery of exemplary damages based
on the fraud/conspiracy cause of action. 
See Tex. Civ. Prac. &
Rem. Code Ann. ' 41.003 (Vernon
Supp. 2006).  The jury answered Question
No. Ten in the affirmative.  However, the
jury subsequently did not award Great Western any exemplary damages.  Since the jury=s
affirmative answer to Question No. Ten did not support an award of any
additional damages against Marilyn, we do not consider her challenge to its
submission.  Rule 47.1.  

 

 

 





[17]Marilyn did not work outside of the home.  She testified that she believed Alan made a
salary of $70,000 a year. 





[18]Alan began stealing money from Great Western in
1991.  He stole a total of $11,516.62
from Great Western in 1991 in four transactions scattered throughout the
year.  From 1992 to 2000, he diverted
funds on a monthly  basis.   Beginning in November 2000, Alan diverted
funds at least twice a month.





[19]Marilyn also attempts to rely upon a claim of factual
insufficiency to attack the submission of these damage questions in the court=s charge.  We
have overruled this claim in the previous section of this opinion labeled APreliminary Procedural Matter.@





[20]Austin McCloud, Retired Chief Justice, Court of
Appeals, 11th District of Texas at Eastland sitting by assignment.